UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

PROSLIDE TECHNOLOGY INC.,

      Plaintiff,

v.

WHITEWATER WEST INDUSTRIES,
LTD.,

      Defendant.

Case No.: 6:20-cv-02189-CEM-DCI

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................1

II.   LEGAL STANDARDS ....................................................................1

III.  ARGUMENT ................................................................................1

    A.    Genuine Issues of Material Fact Preclude Summary Judgment on WhiteWater's Assertion That the '508 and '783 Patents Are Invalid for Improper Inventorship ........................................................1

    B.    Genuine Issues of Disputed Fact Preclude Summary Judgment on WhiteWater's Assertion That the "On-Sale Bar" Invalidates the Asserted Design Patents ...............................................................8

        1.    The '906 and '732 Patented Designs Were Not Offered for Sale Before the Critical Date ......................................................8

        2.    The '804 Patented Design Was Not Offered for Sale Before the Critical Date .........................................................10

    C.    WhiteWater Has Failed to Show by Clear and Convincing Evidence That the Asserted Claims of the Utility Patents Are Indefinite............................................................................13

        1.    The "Pitch/Roll" Terms Are Not Indefinite ...........................14

        2.    "Sliding Surface" Is Not Indefinite........................................16

        3.    "Inner/Outer Boundary" Is Not Indefinite..............................18

        4.    The "Radius" Terms Are Not Indefinite .................................21

        5.    "Substantially Planar" and "Planar Surface" Are Not Indefinite................................................................22

        6.    "Non-Predetermined Path From an Entry to an Exit" Is Not Indefinite................................................................25

        7.    The Asserted Claims of the '111 and '480 Patents Are Not Indefinite for Lack of an Antecedent Basis ..............................28

        8.    Terms of Degree Do Not Render the Asserted Claims of the '111 and '480 Patents Indefinite .........................................29

D.    Genuine Issues of Disputed Fact Preclude Summary Judgment of
       Noninfringement ............................................................................. 31

       1.    The Evidence at Trial Will Show That the Tailspin
             Infringes the Asserted Claims of the '783 Patent ....................... 32

             a.    WhiteWater's Tailspin satisfies the "sliding surface"
                   terms ................................................................................. 32

             b.    WhiteWater's Tailspin satisfies the "height with
                   respect to the sliding surface" terms ............................... 33

       2.    The Evidence at Trial Will Show That the Orbiter
             Infringes the Asserted Claims of the '508 and '783 Patents ....... 33

             a.    WhiteWater's Orbiter satisfies the "pitch" and
                   "roll" terms ...................................................................... 33

             b.    WhiteWater's Orbiter satisfies the
                   "increase/decrease continuously" terms ......................... 34

             c.    WhiteWater's Orbiter satisfies the "radius" term of
                   claim 9 .............................................................................. 34

             d.    WhiteWater's Orbiter satisfies the "inner core
                   portion defining an inner boundary of the sliding
                   surface" terms ................................................................... 35

       3.    The Evidence at Trial Will Show That the Aquasphere
             Infringes the Asserted Claims of the '111 and '480 Patents ....... 36

       4.    The Evidence at Trial Will Show That the Parallel Pursuit
             Infringes the D'804 Patent ......................................................... 36

IV.    CONCLUSION .......................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acromed Corp. v. Sofamor Danek Grp., Inc.*,
    253 F.3d 1371 (Fed. Cir. 2001) ............................................................2

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
    725 F.2d 1350 (Fed. Cir. 1984) ..........................................................13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................1

*Board of Educ. ex rel. Bd. of Trustees of Florida State University v. American Bioscience, Inc.*,
    333 F.3d 1330 (Fed. Cir. 2003) ............................................................5

*Braun Inc. v. Dynamics Corporation of America*,
    975 F.2d 815 (Fed. Cir. 1992) ............................................................37

*Burroughs Wellcome Co. v. Barr Lab., Inc.*,
    40 F.3d 1223 (Fed. Cir. 1994) ..............................................................2

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
    157 F.3d 1340 (Fed. Cir. 1998) ........................................................2, 5

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*,
    134 F.3d 1085 (Fed. Cir. 1998) ........................................................7, 8

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................1

*Checkpoint Sys. v. All-Tag Sec. S.A.*,
    412 F.3d 1331 (Fed. Cir. 2005) ............................................................2

*Columbia Sportswear N. Am., Inc. v. Serious Innovative Accessories, Inc.*,
    942 F.3d 1119 (Fed. Cir. 2019) ..........................................................37

*Contessa Food Products, Inc. v. Conagra, Inc.*,
    282 F. 3d 1370 (Fed. Cir. 2002) .........................................................37

*Crocs, Inc. v. Int'l Trade Comm'n*,
    598 F.3d 1294, 1303 (Fed. Cir. 2010) ................................................37

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*,
    635 F.3d 1373 (Fed. Cir. 2011) ........................................................... 34

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) ........................................... 31

*Deere & Co. v. Bush Hog, LLC*,
    703 F.3d 1349 (Fed. Cir. 2012) ........................................................... 23

*Denneroll Holdings Pty Ltd. v. Chirodesign Group, LLC*,
    No. 4:15-CV-740, 2016 U.S. Dist. LEXIS 21977 (E.D. Tex. Feb. 23,
    2016) ...................................................................................................... 30

*Egyptian Goddess v. Swisa*,
    543 F.3d 665, 677-78 (Fed. Cir. 2008) ................................................ 36

*Ethicon, Inc. v. U.S. Surgical Corp.*,
    135 F.3d 1456 (Fed. Cir. 1998) ............................................................. 2

*Exxon Research and Eng. Co.*,
    256 F.3d 1371 (Fed. Cir. 2001) ..................................................... 13, 22

*Fox Grp., Inc. v. Cree, Inc.*,
    700 F.3d 1300 (Fed. Cir. 2012) ............................................................. 2

*Gart v. Logitech, Inc.*,
    254 F.3d 1334 (Fed. Cir. 2001) ........................................................... 31

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
    383 F.3d 1352 (Fed. Cir. 2004) ....................................................... 2, 3

*Immersion Corp. v. Motorola Mobility LLC*,
    2018 U.S. Dist. LEXIS 183117 (D. Del. Oct. 25, 2018) ..................... 23

*Invensas Corp. v. Samsung Elecs. Co.*,
    No. 2:17-CV-00670, 2018 U.S. Dist. LEXIS 184263 (E.D. Tex. Oct.
    26, 2018) ............................................................................................... 23

*Kluhsman Mach. v. Dino Paoli Srl*,
    No. 5:19-CV-00020, 2020 Dist. LEXIS 133155 (N.D. Cal. July 23,
    2020) ...................................................................................................... 23

*Memorylink Corp. v. 34 Motorola Solutions, Inc.*,
    2013 WL 4401676 (N.D. Ill. 2013) ........................................................ 4

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
520 F.3d 1367 (Fed. Cir. 2008) ...................................................................... 13

*Multiwave Sensors, Inc. v. Sunsight Instruments, LLC*,
283 F. Supp. 3d 1279 (M.D. Fla. 2017) ..................................................... 23, 30

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ................................................................................. 13, 14

*Pannu v. Iolab Corp.*,
155 F.3d 1344 (Fed. Cir. 1998) ........................................................................ 7

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................................................... 35

*Plastipak Packaging, Inc. v. Premium Waters, Inc.*,
55 F.4th 1332 (Fed. Cir. 2022) ..................................................................... 2, 3

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*,
758 F.2d 613 (Fed. Cir. 1985) ...................................................................... 5, 7

*Shire LLC v. Amneal Pharms., LLC*,
802 F.3d 1301 (Fed. Cir. 2015) ...................................................................... 12

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) ................................................................. 23, 29

*Total Control Sports, Inc. v. Precision Impact*,
No. 17-cv-09281, 2019 U.S. Dist. LEXIS 207513 (N. D. Ill. Dec. 2,
2019) ............................................................................................................... 23

*United States v. Diebold, Inc.*,
369 U.S. 654 (1992) ......................................................................................... 1

*Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997) ......................................................................................... 31

**Federal Statutes**

35 U.S.C. § 256 ................................................................................................. 7

35 U.S.C. § 256(b) ......................................................................................... 7, 8

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................ 1

**Other Authorities**

https://www.archiexpo.com/prod/polin-waterparks/product-64440-
834954.html (last visited Mar. 3, 2023) ............................................................39

# I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

In shotgun fashion, WhiteWater asks this Court to summarily rule on nearly every disputed issue in this case, despite a plethora of disputed material facts. Specifically, WhiteWater seeks summary determinations that, as a matter of law, (i) each asserted patent is invalid, (ii) 41 claim terms of the asserted patents are indefinite, and (iii) each accused product does not infringe the asserted patents. Each of these issues, however, is laden with factual disputes. Indeed, as explained below, each of WhiteWater's assertions is directly refuted by the record evidence, including factual and expert testimony and opinions. Accordingly, the Court should deny WhiteWater's Motion in its entirety.

# II.    LEGAL STANDARDS

Summary judgment may be granted only when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992).

# III.    ARGUMENT

## A.    Genuine Issues of Material Fact Preclude Summary Judgment on WhiteWater's Assertion That the '508 and '783 Patents Are Invalid for Improper Inventorship

Courts presume that the named inventors on a patent are the true and only

inventors. *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004); *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001). To overcome this presumption, on a motion for summary judgment, the party challenging inventorship must prove by clear and convincing evidence that the invention was made by another inventor. *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012). If there is a genuine issue of material fact regarding inventorship, summary judgment should not be granted. *Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 55 F.4th 1332, 1341-43 (Fed. Cir. 2022); *Checkpoint Sys. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1334 (Fed. Cir. 2005).

"The 'inventor,' in patent law, is the person or persons who conceived the patented invention." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1352 (Fed. Cir. 1998); *see also Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1227–28 (Fed. Cir. 1994) ("Conception is the touchstone of inventorship, the completion of the mental part of invention."). It is well settled that "merely assisting" after conception does not qualify one as a joint inventor because an inventor may use "ideas[] and aid of others in the process of perfecting his invention without losing his right to a patent." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).

Here, WhiteWater falls far short of the "clear and convincing" standard required to prove improper inventorship. *Ethicon*, 135 F.3d at 1461; *see also Plastipak Packaging*, 55 F.4th at 1340 ("[A] moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts

underlying invalidity that no reasonable jury could find otherwise."). Indeed, the undisputed facts strongly *refute* rather than support WhiteWater's position that Mr. Hunter is not the true inventor of the '508 and '783 patents.

Not only is Mr. Hunter officially named as the sole inventor on the face of the '508 and '783 patents, thereby creating a presumption that he is the correct inventor, *Gemstar-TV Guide*, 383 F.3d at 1381, his testimony clearly shows that he is the sole inventor of these patents. (Ex. A[1] (Hunter Dep. Tr., Vol. I), 20:18-22:18, 29:10-23, 101:22-102:4, 242:23-243:9.) Mr. Hunter's testimony is corroborated by that of Greg White, ProSlide's VP of Products:

> **Q.** Who conceived of the FlyingSAUCER product?
> **A.** Rick Hunter . . . Rick Hunter invented the underlying technology that then became the FlyingSAUCER product commercialized by ProSlide.

(Ex. B (White Dep. Tr.), 64:3-8; *see also id.*, 66:16-67:21.)

Even more damning to WhiteWater's position, both Mr. Brazeau and Mr. Smegal—two individuals WhiteWater contends should have been named as inventors—testified unequivocally that Mr. Hunter solely conceived of the claimed inventions and was correctly named as the sole inventor on the patents. (Ex. C (Brazeau Dep. Tr.), 20:18-22:18, 104:4-12, 143:15-19; Ex. D (Smegal Tr., Vol. II), 70:14-20, 122:12-123:9; 160:18-161:9, 169:4-25.)

> **Q.** Does the inventor of the product give you the product?
> **A.** The inventor of the products gives us the idea for the product, and as product development designers, we then work together to

---

[1] Unless otherwise stated, the exhibits cited herein refer to exhibits attached to the Declaration of Anthony Berlenbach, filed concurrently herewith.

turn it into a commercialized product.

. . .

**Q.** Okay. So for DVP-239 flying saucer, what was that initial transmission from the inventor to you?

**A.** I don't recall.

**Q.** Do you recall who it was from?

**A.** Yes, I do.

**Q.** Who is that?

**A. From Rick Hunter.**

(Ex. C, 20:18-22:18 (emphasis added).)

> **Q.** Whose idea was it to have a FlyingSAUCER concept with weightlessness as part of the ride experience?
>
> **A. Rick Hunter is the invention -- inventor of the FlyingSAUCER, so I presume it was him**.

(Ex. D, 70:14-20 (emphasis added) (counsel's objection omitted).)

> **Q.** So in the several years you interacted with Mr. Hunter on the development of the claimed invention of the '508 and '783 patents, the only examples you remember of what he shared with you are a vision of a ride like a ski turn path and a ride with an uphill model of the FlyingSAUCER?
>
> **A.** . . . Eight years ago, as I sit here today, that's what I recall. **And I'm very, very confident in my opinion that Mr. Hunter is the inventor on the FlyingSAUCER patent**.

(Ex. D, 169:4-25 (emphasis added) (counsel's objection omitted).)

Thus, the very people WhiteWater contends are the true inventors of the '508 and '783 patents testified under oath that they are *not* the inventors of those patents and that Mr. Hunter is the sole and correct inventor, precisely as shown on the face of the patents. This, by itself, is enough to defeat WhiteWater's baseless allegations of incorrect inventorship. *See Memorylink Corp. v. 34 Motorola Solutions, Inc.*, 2013 WL 4401676, *10-*11 (N.D. Ill. 2013) (dismissing an omitted-inventor defense on summary judgment because the alleged omitted inventors "admit that they were not

inventors of the [asserted] Patent," which "is fatal" to the claim).

As Mr. Brazeau explained, Mr. Hunter came to him and the rest of the team with fully formed conceptions of his inventions and sought Mr. Brazeau's assistance in getting his idea manufactured and sold. (Ex. C, 20:18-22:18; *see also* Ex. B, 67:13-21.) These facts do not support WhiteWater's co-inventorship theory. *See, e.g., Board of Educ. ex rel. Bd. of Trustees of Florida State University v. American Bioscience, Inc.*, 333 F.3d 1330, 1338 (Fed. Cir. 2003) ("One does not qualify as a joint inventor merely by assisting the actual inventor."); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985) ("[A]n inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent."); *C.R. Bard*, 157 F.3d at 1352 ("others may provide services in perfecting the invention conceived by another without becoming an 'inventor' by operation of law").

WhiteWater attempts to sidestep these facts by focusing on two specific claim terms: "support structure" and "roll." But here, too, there are numerous disputed material facts that preclude summary judgment.

First, ProSlide disputes WhiteWater's assertion that Mr. Hunter did not invent claim 24 of the '508 patent, which recites "a support structure . . . configured to dynamically impart movement to the slide feature." (Doc. 189-4, 20:22-25.) Claim 24 has never been asserted in this case. Thus, there has been no discovery or claim constructions related to that claim. WhiteWater relies on a single deposition question, asked out of context, as the sole support for its assertion. (Doc. 189 at 6-7.) Mr. Hunter was asked about his mental thoughts from *eight years earlier*, namely whether he

contemplated in 2014 that "the support structure should be dynamic and move."
(Ex. A, 157:14-20.) At his deposition, he could not recall doing so, (*id.* ("Not to my
knowledge.")), but that does not mean he did not. The more relevant evidence on this
point is Mr. Hunter's contemporaneous sworn declaration from 2017 that he did, in
fact, invent everything described in his patent application submitted on June 13, 2014,
including the concept of a dynamic support structure. (Doc. 189-33 at 301-02.) At the
very least, this creates a material dispute precluding summary judgment on this issue.

Second, ProSlide disputes WhiteWater's assertion that Messrs. Smegal,
Brazeau, and Daric invented the "roll" terms in the '508 and '783 patents merely
because they were listed as persons involved in a Scientific Research and Experimental
Development ("SRED") project for purposes of seeking Canadian tax credits.
WhiteWater provides no evidence that there is any legal relationship between a
Canadian SRED submission and the determination of inventorship under U.S. patent
law. WhiteWater could have, for instance, provided expert testimony on this topic but
strategically opted not to, hoping instead that the Court would simply *presume* that the
requirements for a Canadian SRED application are the same as the requirements for
inventorship under U.S. law. They are not. As explained by Mr. Hunter, the
individuals listed on the SRED were working to reduce his conception to production.
(Doc. 189-13 (Hunter Dep. Tr., Vol. III), 394:21-395:2.) Moreover, the project
described in the 2014 SRED application relates to a "looping flume ride." (Doc. 189-
24 at 1.) In contrast, the '508 and '783 patents are directed to a "substantially planar"
sliding surface that is intended to "*reduc[e]* the 'flume feel' of the slide feature." (Doc.

189-4, 16:9-10, Figs. 14C and 15A (emphasis added).) Thus, there is no evidence that these were even the same project. But even if they were, post-conception efforts to transform an invention into a commercial product do not amount to inventorship under U.S. law. *See, e.g.*, *Shatterproof Glass*, 758 F.2d at 624.

Indeed, it is telling that WhiteWater's motion lacks any assertion from Messrs. Smegal, Brazeau, or Daric that *they* believe themselves to be co-inventors of the '508 and '783 patents by virtue of being listed on the 2014 SRED report. Quite the contrary, Mr. Brazeau and Mr. Smegal[2] testified unequivocally that Mr. Hunter is the sole inventor, as shown on the face of the patents. (Ex. C, 20:18-22:18, 104:4-12, 143:15-19; Ex. D, 70:14-20, 122:12-123:9; 160:18-161:9, 169:4-25.) These facts—which directly refute WhiteWater's allegation of incorrect inventorship—are more than enough to defeat WhiteWater's motion for summary judgment on this issue.

Lastly, even if a party can prove that the invention was made by another inventor, "[i]ncorrect inventorship is a technical defect in a patent that may be easily curable." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998). Specifically, under 35 U.S.C. § 256, "[i]f a patentee demonstrates that inventorship can be corrected . . . a district court *must* order correction of the patent, thus saving it from being rendered invalid." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998) (emphasis added); *see also* 35 U.S.C. § 256(b) ("The error of omitting inventors . . . shall not invalidate the patent in which such error occurred if it can be

---

[2] WhiteWater did not seek to depose Mr. Daric in this matter.

corrected as provided in this section.").

Thus, even if Mr. Hunter were found to be a co-inventor of the '508 and '783 patents, along with other ProSlide employees, the result would simply be correction of inventorship under 35 U.S.C. § 256(b), which would preserve the patents' validity. This means WhiteWater's request for summary judgment of incorrect inventorship, aside from being plagued with factual disputes, is an exercise in futility because incorrect inventorship is merely a "technical defect" that is "easily curable" under 35 U.S.C. § 256(b), either before or after trial. *Canon Computer*, 134 F.3d at 1089.

### B.    Genuine Issues of Disputed Fact Preclude Summary Judgment on WhiteWater's Assertion That the "On-Sale Bar" Invalidates the Asserted Design Patents

#### 1.    The '906 and '732 Patented Designs Were Not Offered for Sale Before the Critical Date

WhiteWater seeks summary judgment of invalidity of the '960 and '732 design patents because it contends each design was offered for sale prior to the critical date. (Doc. 189 at 10-11.) This issue, however, is riddled with disputed material facts. Indeed, this very argument was the subject of extensive expert discovery, and ProSlide's expert, Mr. Tanzer, marched through the relevant documents to explain why WhiteWater's representation that the full Whitecap Racer design was disclosed to Hersheypark before April 16, 2017, is wrong. (Doc. 197-6 (Tanzer Rebuttal Report), ¶ 55 (considering more than 30 exhibits in support of his opinion).)

Specifically, Mr. Tanzer explains that there is no evidence for Mr. Delman's *assumption* that the P16-171-B-09 CAD file was attached to an email communication

dated March 30, 2017. (Doc. 197-6, ¶¶ 88-89.) The email itself clearly shows that no CAD files were included as attachments. (Doc. 225-4 at Ex. 8.) Instead, the evidence shows that ProSlide conveyed a pdf, titled "P16-171-B-09-HersheyPark-Client Signoff.pdf," (*id.*), showing an unfinished "OctopusRACER". (Doc. 197-6, ¶¶ 84-85.) Mr. Janovich also confirmed that the designs were still in early stages because the ride was not targeted to be completed or opened until the following year. (Ex. E (Janovich Dep. Tr.), 152:2-18.) But even without this testimony, a lay person can clearly see the difference between the unfinished entry pool of the pdf attachment sent on April 7, 2017 (left) and the start tub designs later included in the CAD file that WhiteWater alleges was sent to Hersheypark on April 7, 2017 (right):



Janovich Ex. 9
(with the unfinished entry pool highlighted)

PROSLIDE_00145359

(*See* Doc. 197-6, ¶ 90.)

Recognizing the stark difference, WhiteWater attempts to confuse the issue by asserting that the P16-171-B-09 CAD file was provided to Hersheypark on April 7, 2017. (Doc. 189 at 10-11.) But this assertion is likewise devoid of factual support. As Mr. Tanzer explained, the start pool design of the CAD file was likely not completed

until November 2017, after the critical date. (Doc. 197-6, ¶ 95.) The file itself shows a "last modified" date of November 17, 2017. *Id.* Moreover, other communications show that from March through October of 2017, the start tubs were "in development," there were plans to create a "new Mat Racer Start Pool," and the communications included drawings which still did not contain the final start area design. (Doc. 197-6, ¶¶ 103-27.) Thus, the evidence shows that WhiteWater's theory is incorrect—i.e., the design of the start area of the 6-lane racer was *neither* communicated to Hersheypark as of April 7, 2017, *nor* completed until well after the critical date.

Similarly, WhiteWater's argument that the '906 and '732 patents were ready for patenting on April 7, 2017, is also incorrect. As stated above, the CAD file that WhiteWater relies on for this theory was neither completed nor shared with Hersheypark as of April 7, 2017. And the design that *was* shared—the pdf of an unfinished OctopusRACER—was incomplete and did not teach the patented designs.

### 2. The '804 Patented Design Was Not Offered for Sale Before the Critical Date

WhiteWater contends that ProSlide's Mr. Janovich conveyed layouts depicting the '804 patented design to individuals at Water Technology, Inc. prior to the patent's critical date. (Doc. 189 at 12.) But WhiteWater is incorrect that the layouts in the communicated attachments are the subject of the '804 design patent. (Doc. 197-6, ¶ 61 ("[I]t is clear to me that this start area and the open straightway area are not substantially the same or identical in all material respects to any of the Claimed Designs of the Asserted Patents.").) Mr. Tanzer's testimony alone presents sufficient

disputed facts to defeat WhiteWater's summary judgment motion on this issue. But even further, a lay person would recognize that the P16-171-B-04-Mesh.dwg file that WhiteWater relies on does not depict the patented design, as shown below:



Ex. F[3]

Doc. 189-9, Fig. 1

Contrary to WhiteWater's assertion that Mr. Tanzer only identifies differences not claimed in the '804 patent, Mr. Tanzer makes clear in his report that his review of the straightway area for the proposed design included the transition from the closed flume to the open racing element and the transition from the open racing element to the closed flume. (*See* Doc. 197-6, ¶ 60.)

Additionally, WhiteWater contends that the drawing file's design was sufficiently specific to enable a person of ordinary skill in the art ("POSA") to recreate the patented design. WhiteWater provides no factual or expert testimony to support this contention, only attorney argument. This does not satisfy WhiteWater's burden.

Moreover, the evidence shows that the drawing file was not sufficient to enable

---

[3] This image offers another perspective view of the P16-171-B-04-Mesh.dwg file that is referenced in Mr. Tanzer's Rebuttal Report at pp. 32-33. *See* PROSLIDE_00145356.

a POSA to recreate the patented design. (*See* Ex. F.) The '804 patent generally claims two adjacent portions of a transition between open and closed sections of a water ride situated on either end of an unclaimed pair of open lanes. (Doc. 197-6, ¶ 99.) As can be seen above, the drawing file that WhiteWater relies on does not include two adjacent portions of a transition between open and closed sections of a water ride.

Indeed, during prosecution of the '804 patent, the Examiner considered designs similar to the mesh drawing file, which also do not have transitions, and had no issue allowing the claimed design over these designs. For instance, the Examiner considered U.S. Patent No. D637,253 (attached hereto as Ex. G) and U.S. Application No. 11/512,713 (attached hereto as Ex. H). As can be seen below, neither the '253 patent nor the '713 application included transitions between the open and closed sections:



Ex. G, Fig. 2          Ex. H, Fig. 1

The fact that the USPTO issued the '804 patent fully aware of these prior art designs that, like the drawing file that WhiteWater now relies on, did not include transitions, refutes WhiteWater's position that the patented design is merely an obvious modification of the drawing file. (Doc. 189 at 13.) The Examiner reached the opposite conclusion, and this conclusion is entitled to deference. *Shire LLC v. Amneal*

*Pharms., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015). Thus, the evidence shows that the '804 patent is valid. At the very least, disputed issues of material fact preclude WhiteWater's request for summary judgment on invalidity.

### C.     WhiteWater Has Failed to Show by Clear and Convincing Evidence That the Asserted Claims of the Utility Patents Are Indefinite

Continuing with its shotgun approach, WhiteWater contends that no fewer than *41* claim terms in the asserted utility patents are indefinite because, allegedly, a POSA would not be able to discern their meaning. (*See* Docs. 68, 179.) Yet the highly trained Examiners at the USPTO had no problem understanding the meaning of these claim terms, as evidenced by the fact that they allowed the patents to issue after a thorough examination process. WhiteWater would have this Court believe that these Examiners made *41* mistakes in issuing the asserted utility patents—a dubious proposition on its face.

Because patent claims are presumed valid, they are also presumed to be definite. *See Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008). This presumption is based on "the basic proposition that a government agency such as the [USPTO] was presumed to do its job." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).

It is well settled that if a claim's meaning is discernible to a POSA, it is not indefinite as a matter of law. *Exxon Research and Eng. Co.*, 256 F.3d 1371, 1375 (Fed. Cir. 2001). This standard "mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). Thus,

"the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id.* (citations omitted).

### 1.    The "Pitch/Roll" Terms Are Not Indefinite

WhiteWater first contends the pitch/roll claims are indefinite because, according to its paid expert Dr. Stevick, "if the surface has any curvature at all, then pitch and roll angles claimed cannot be defined." (Doc. 189 at 19-20.) This is the crux of WhiteWater's argument, i.e., that because some of the asserted claims allow for non-planar sliding surfaces (e.g., "*substantially* planar"), those sliding surfaces cannot possibly have a pitch or roll angle, as claimed.

WhiteWater's premise is wrong. Even laypersons are aware that objects such as aircraft, boats, ships, submarines, surfboards, and jet skis, can have pitch and roll angles despite having mostly or entirely curved surfaces. Thus, as ProSlide's expert Mr. Young explains, the pitch/roll terms "provide[] reasonable certainty of its meaning to a [POSA], taken in context of the entire patent and its included Figures, because a [POSA] would be able to determine the pitch [or roll] axis and measure the pitch [or roll] angle relative to a horizontal plane." (Doc. 188-7 (Young Decl.), ¶ 67.)

Contrary to WhiteWater's assertion, a POSA would be able to determine the pitch/roll angle of a sliding surface even if it is not perfectly flat. (Doc. 188-7, ¶ 69.) Indeed, the patent specification makes clear that a perfectly flat surface is *not necessary* to determine the pitch/roll angle. (Doc. 188-7, ¶ 69.) For



14

instance, the specification explains that the sliding surface in Figures 1A to 1D is not

perfectly flat but, instead, is "*substantially* planar" or "*generally* flat." (Doc. 189-4,

10:20-22.) Nevertheless, as illustrated above in FIG. 1C of the patent, even with some

curvature, this sliding surface is described as having pitch and roll angles as defined in

the claims. (Doc. 189-4, Fig. 1C.)

Dr. Stevick's opinion is further belied by WhiteWater's own internal

documents, which show that WhiteWater itself can readily determine a pitch/roll

angle for a sliding surface that
is substantially planar rather
than perfectly flat. For
instance, whereas Dr. Stevick
contends that the accused
Orbiter water ride does not
have a perfectly flat sliding



(Ex. I (WHITEWATER0000103))

surface, WhiteWater apparently had no problem determining that this sliding surface

has an ██████████████████████ as shown above in its internal engineering

schematics. This confirms that a POSA understands how to determine pitch/roll

angles, even for surfaces that are not perfectly flat.

WhiteWater alleges that ProSlide admitted during prosecution that a perfectly

planar surface is needed to measure pitch and roll angles. (Doc. 189 at 21.) That is

incorrect. ProSlide merely argued that it was unclear whether the high-banking,

funnel-shaped wall of the '492 patent would satisfy the claimed pitch/roll limitations.

(Doc. 189-33 at 657-58.) In no way is this an admission that *perfectly flat* surfaces are required to determine pitch/roll angles, which, in any event, the specification explains is not the case.

Finally, WhiteWater argues that because the pitch and roll axes can be arbitrarily assigned and interchanged, this means the terms must be indefinite. That, too, is incorrect. As explained by Mr. Young, for a given water slide, a POSA would understand where to place the pitch and roll axes as described in the patents. (*See e.g.*, Doc. 188-7, ¶¶ 66-71; *see also* Doc. 197-1 (Young Opening Rep.), ¶¶ 97–120 (conducting the pitch and roll analysis on the Orbiter product).) Indeed, as explained above, WhiteWater itself had no problem determining where to place the "inclination" axis for its own Orbiter water ride.

### 2.    "Sliding Surface" Is Not Indefinite

WhiteWater contends "sliding surface" is indefinite because a POSA allegedly would not understand how to determine where the transition occurs between the sliding surface and the inrun/outrun in the claimed water rides. It contends that lines 111 and 113 in Fig. 1A of the patents define the *exact* location of those transitions and, because the transitions may vary from ride to ride and "may be smooth and not apparent to riders," (Doc. 189-4, 4:60-63), this somehow renders "sliding surface" indefinite. (Doc. 189 at 22-24.)

WhiteWater is wrong. As the patent clearly explains, lines 111 and 113 merely show "*in general terms*" where the inrun can transition to the sliding surface and where the sliding surface can transition to the outrun. (Doc. 189-4, 4:53–60 (emphasis

added).) These lines are not intended to be strict dividing lines as WhiteWater asserts. Indeed, the specification further explains that "it should be understood that lines 111 and 113 could be drawn in other locations," i.e., these transitions could occur at other points depending on the ride design. *Id.*, 4:60-63.

As Mr. Young explains, A POSA would readily understand where the sliding surface transitions to the inrun and outrun. (Doc. 188-7, ¶¶ 61-65.) He explains that the inrun is the area where the rider first enters the slide feature from the entry chute and the outrun is the area where the rider is about to slide into the exit chute. *Id.*, ¶ 63 (further explaining that "[t]he inrun [and outrun] will typically have a different surface curvature than sliding surface 120 in order to smoothly connect the entry [or exit] chute to sliding surface 120"). Mr. Young also explains that a POSA would recognize the transition *zones* between these elements (i.e., where the chute profile of the inrun/outrun transitions to the profile of the slide feature) and would further recognize that there are not exact transition *lines* as WhiteWater contends. *Id.*, ¶ 63; *see also* Doc. 188-10, 172:20-173:16 ("███████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████.")

The term "sliding surface" is commonly used and well-understood in the water ride industry. (Doc. 188-7, ¶ 62.) Indeed, although WhiteWater now feigns confusion about the concept of a "sliding surface" that extends between an inrun and an outrun, when it filed its own copycat Saucer patent after seeing ProSlide's FlyingSAUCER patents,[4] WhiteWater used almost identical terminology. (Ex. J (U.S. Pat. No. 11,358,068) (claim 1 reciting "an entrance, an exit, and a *ride surface connecting the entrance and the exit*."). WhiteWater's copycat Saucer patent describes and illustrates a saucer-shaped ride (*see* FIG. 1C, inset) in which "[a] rider may be



FIG. 1C

permitted to ride upon the *riding surface* **145** . . . while traversing the waterslide feature **101** from entrance **102** to exit **104**." *Id.* at 4:18-20. Thus, WhiteWater cannot seriously contend that this same type of description of a "sliding surface" in the '508 and '783 patents is somehow indefinite.

### 3.    "Inner/Outer Boundary" Is Not Indefinite

WhiteWater's contention that the inner/outer boundary limitations are indefinite also fails. For instance, WhiteWater contends that the inner boundary limitations (i.e., "a curved inner lip extending from the inrun to the outrun, the inner lip defining an inner boundary of the sliding surface" (claim 1) or "an inner core

---

[4] WhiteWater's '068 patent claims priority to a provisional application that was filed on Sep. 21, 2018—almost three years *after* ProSlide's application for the '508 patent published. (*See* Doc. 189-4 (identifying a PCT publication date of Dec. 17, 2015).)

portion defining an inner boundary of the sliding surface" (claim 20)) are indefinite because the inner lip and the inner core portion fall below lines 111 and 113 in Fig. 1A. Again, WhiteWater contends (incorrectly) that anything below lines 111 and 113 is not part of the sliding surface and therefore cannot define the inner boundary of the sliding surface. This is wrong.

As the claim language makes clear, the "inner lip" or "inner core portion" extend from the inrun to the outrun. (Doc. 189-3, 19:20-23, 19:41-42, 20:27-29.) This has nothing to do with the geometric reference lines 111 and 113. Moreover, the specification clearly explains that the "inner lip 150 is depicted extending between the inrun 110 and the outrun 112 opposite the outer lip 122 as a safety feature for preventing riders or ride vehicles from sliding out of the slide feature 102." *Id.*, 7:15–18. A POSA would readily understand from this description that the inner lip defines the inner boundary of the sliding surface (i.e., it prevents riders from sliding off the sliding surface). (Doc. 188-7, ¶¶ 98-100.)

The figures of the '783 patent also provides guidance to a POSA. Referring to Fig. 14A, the inner lip 1450, the inner core portion 1452, and the sliding surface 1420 are all identified and clearly visible. (Doc. 189-3, 15:28-39.) Thus, in contrast to WhiteWater's assertion, an ordinary artisan, familiar with commercial water rides and having reviewed the patent specification, would readily understand what it means for an inner lip or inner core portion to extend between an inrun and an outrun and define an inner boundary that acts as a safety feature by preventing riders and/or ride vehicles from sliding out of the slide feature. (Doc. 188-7, ¶¶ 99-100.)

19

Similar to the inner boundary terms, the outer boundary terms (i.e., "a curved outer lip extending from the inrun to the outrun, the outer lip defining and outer boundary of the sliding surface") are reasonably ascertainable to a person of ordinary skill in the art. In addition to the clear claim language, the '783 specification provides guidance that the outer lip 122 is "located along an outer circumferential edge of the slide feature." (Doc. 189-3, 6:40–42.) The figures also clearly identify the outer lip 122 (*see* Fig. 1). Thus, an ordinary artisan, familiar with commercial water rides and having reviewed the patent specification, would readily understand the outer boundary terms. (Doc. 188-7, ¶¶ 96-97.)

As a fallback, WhiteWater also argues that the outer boundary limitations are indefinite because there is a smooth transition from the sliding surface to the outer lip, and thus no ascertainable boundary. (Doc. 189 at 26.) This again is incorrect. The '783 specification explains that the outer lip 122 is "located along an outer circumferential edge of the slide feature." (Doc. 189-3, 6:40–42.) This outer lip is also clearly shown as item 122 in the patent figures. *Id.*, 5:31-33. The mere fact that the transition from the outer lip to the sliding surface is smooth does not erase the *existence* of the outer lip, as WhiteWater illogically contends.

Indeed, although WhiteWater now contends that a smooth transition from the sliding surface to the outer lip somehow renders these terms indefinite, WhiteWater itself used almost identical language in its copycat Saucer patent. (Ex. J, 6:14-19 ("In certain embodiments, there may be *no difference or demarcation between the ride surface portion* **220** *and the exterior wall* **222** such that there is a *single, smooth and/or uninterrupted*

surface comprising both the ride surface portion **220** and the exterior wall **222** . . .").)

WhiteWater should not be heard to argue that a smooth transition renders the claims

indefinite in ProSlide's patents when WhiteWater used virtually the same language in

its own copycat Saucer patent.

### 4. The "Radius" Terms Are Not Indefinite

WhiteWater contends the radius terms are indefinite because a POSA allegedly

would not be able to locate the central point of the slide feature, which WhiteWater

contends is needed to ascertain the radii of the outer lip. This is incorrect. As Mr.

Young explains, a POSA would readily understand how to measure the radius of the

sliding surface or outer lip. (Doc. 188-7, ¶¶ 109-112.) The specification provides that

the radius of the sliding surface may be measured relative to a point 136 proximal to a

center portion of the slide feature 102, where this center portion may be a geometric

center of the slide feature 102, a radial center of an arcuate path traveled by a rider or

ride vehicle, or another centrally located portion of the slide feature 102)." (Doc. 189-

3, 7:44-52.)

The figures and specification of the '783 further teach what is meant by the

radius terms. For instance, referring to Figs. 14A to 14C, the specification provides

that "the outer lip 1422 has a compounding outer radius with respect to a point 1436

proximal to a center portion of the slide feature 1402. A compounding outer radius,

unlike a constant outer radius, varies in length around the outer lip 1422 of the slide

feature 1402. The outer radius may be longest proximal to the inrun 1410 and to the

outrun 1412, and may be shortest halfway along the outer lip 1422 between the inrun

1410 and the outrun 1412, with smooth transitions in between." (Doc. 189-3, 15:40–48; *see also id.*, Figs. 14A, 14B, and 14C.)

Moreover, even without this explanation, a POSA would readily understand how to measure a radius, including a compound radius. (Doc. 188-7, ¶¶ 131-134, 136-150.) For instance, Mr. Young expressed no difficulty in using the SolidWorks CAD program to measure the compound radius of the Orbiter product, and he provided these measurements in his opening report. (Doc. 197-1, ¶ 235.) WhiteWater's expert, Dr. Stevick, conceded that use of CAD software such as SolidWorks to measure a compound radius is a well-known and appropriate method:



(Ex. K (Stevick Dep. Tr. Vol. I), 169:18-170:14 (objections omitted).) Because a POSA can reasonably ascertain the meaning of the radius terms and can easily measure the radii of a water ride's slide surface using well-known, commercial software, these terms are not indefinite as a matter of law. *Exxon*, 256 F.3d at 1375.

### 5.    "Substantially Planar" and "Planar Surface" Are Not Indefinite

Contrary to WhiteWater's assertion, claims that use terms of degree, such as "generally" and "substantially," are not inherently indefinite, especially when the

patentee provides descriptions and examples in the specification that provide guidance to a POSA as to the scope of the claimed invention. *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017); *Multiwave Sensors, Inc. v. Sunsight Instruments, LLC*, 283 F. Supp. 3d 1279, 1286 (M.D. Fla. 2017) (finding "substantially perpendicular" not indefinite).

In this case, the '508 patent provides ample guidance and examples regarding the term "substantially planar." For instance, the patent explains that the embodiment depicted in Figures 1A-1D "has a substantially planar sliding surface 120," which is further described as a "generally flat surface." (Doc. 189-4, 6:29-30, 10:20-22.) The specification also provides that "the embodiment illustrated in FIG. 6B [has a] sliding surface 612 [that] while still substantially planar, has a partially helical profile." *Id.*, 13:22-25. These descriptions and accompanying drawings give a POSA sufficient guidance as to the meaning and scope of "substantially planar." *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) (finding "substantially planar" sufficiently definite); *Invensas Corp. v. Samsung Elecs. Co.*, No. 2:17-CV-00670, 2018 U.S. Dist. LEXIS 184263, *7-8 (E.D. Tex. Oct. 26, 2018) (finding "substantially planar" and "substantially coplanar" sufficiently definite); *Immersion Corp. v. Motorola Mobility LLC*, 2018 U.S. Dist. LEXIS 183117, *17-19 (D. Del. Oct. 25, 2018) (finding "approximately planar" sufficiently definite); *Kluhsman Mach. v. Dino Paoli Srl*, No. 5:19-CV-00020, 2020 Dist. LEXIS 133155, at *16 (N.D. Cal. July 23, 2020) (finding "substantially flattened" sufficiently definite); *Total Control Sports, Inc. v. Precision*

*Impact*, No. 17-cv-09281, 2019 U.S. Dist. LEXIS 207513, at *26 (N.D. Ill. Dec. 2, 2019) (finding "substantially horizontal" sufficiently definite).

Contrary to WhiteWater's assertion, a POSA would readily understand these terms, particularly in light of the illustrated examples. For instance, Mr. Young explained his understanding during his deposition. (Doc. 188-10, 102:8-21 ("███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ ").)

Indeed, although WhiteWater now criticizes "substantially planar" as allegedly being indefinite, when it filed its own copycat Saucer patent, it used almost identical language. (Ex. J, 6:11-14 ("The ride surface portion 220 and/or the exterior wall 222 may be any of a variety of shapes or configurations, such as a flat *or substantially flat* . . .").) WhiteWater should not be heard to argue that terms such as "substantially flat" or "substantially planar" are indefinite when it used the same terms in its own copycat Saucer patent.

The remainder of WhiteWater's argument is just a recitation of disputed facts as to whether the accused Orbiter water ride has a "substantially planar" sliding surface—an issue the jury should be allowed to decide. Although WhiteWater is entitled to its opinion, ProSlide will present evidence at trial showing that a POSA would consider the Orbiter's sliding surface to be substantially planar. For example, WhiteWater itself has consistently described the Orbiter as having a "saucer" shape

(Ex. J) or a "disc" shape (Doc. 197-1, ¶¶ 95, 127, 152, 187 (citing WHITEWATER0750632)), which Dr. Stevick concedes is "[t]ypically a flat plate that's round." (Ex. K, 64:12-14.) The jury will also see that the Orbiter's sliding surface (*see e.g.*, Doc. 197-1, ¶ 82), is nearly identical to the "substantially planar" sliding surface illustrated in Figure 1C of the patent (Doc. 189-4, Fig. 1C):



### 6. "Non-Predetermined Path From an Entry to an Exit" Is Not Indefinite

WhiteWater contends that "non-predetermined path from an entry to an exit" in the asserted claims of the '111 patent is indefinite. That is not so. To the contrary, a POSA would readily understand this term in the context of the claimed invention.

First, the '111 specification clearly explains what is meant by a "non-predetermined path":

> [T]he wall, lip or other contour which may be present at edges 718 and 721 do not substantially determine the slide path of the rider. The path of the rider is substantially determined by the curvature of the sliding surface 712 as well as characteristics of the rider or vehicle such as weight and weight distribution, such that the path a rider or vehicle will travel over the surface 712 *is non-predetermined and may vary from rider to rider.*"

(Doc. 189-5, 9:2-9 (emphasis added).) It is clear from this description that a "non-predetermined path" is one that may vary from rider to rider, as opposed to a path that is pre-determined beforehand, like in a flume ride where every rider follows the same defined path. The specification further provides, in reference to Fig. 1, that "the rider can potentially ride over any part of the sliding surface 12. This is in contra[s]t to a flume ride which includes walls or channels to guide the rider along *a predetermined path*." *Id.*, 4:48-52 (emphasis added).

Thus, "for at least a portion of the ride experience, the path of the rider is not predetermined by walls or channels on the sliding surface 12." *Id.*, 4:52-54; *see also id.*, 6:11-15. This is also made clear in Fig. 6B of the '111 patent, showing that rider(s) may potentially find themselves anywhere along the width of the exiting surface after sliding along the curved surface and being affected by speed, weight, and gravity alone, with no forced path of travel on that surface from rigid wall edges or lips. (Doc. 188-7, ¶¶ 35-37.)

Thus, as Mr. Young confirmed, a POSA would understand that a non-predetermined path refers to a path of travel that will vary from rider to rider before reaching the exit point of the curved surface and is not determined beforehand, unlike a flume ride that includes walls or channels to guide the rider along a predetermined path at all times within a narrow range of variance. *Id.*; *see also id.*, ¶¶ 41-46.

WhiteWater asserts that "a non-predetermined path" is contradicted somehow by the additional requirement of claim 1 to "direct one or more riders and/or ride vehicles along the sliding surface on a path which is at least partially upward." This is

nonsensical. A person of ordinary skill in the art would understand that defining one characteristic of a path of travel is not the same as constricting the ride to one path of travel only. *Id.*, ¶ 39, 45. A sliding path of travel can have an upward component and still have infinite possible paths within the range of possibilities, just like there are many different ways to drive from Orlando to Chicago, even though the trip will necessarily include a northward component. *Id.*, ¶ 45.

The same is true of WhiteWater's assertion that the "non-predetermined path" term is contradicted by terms of other claims, such as "upward along the sliding surface in a continuously curved path of more than 180 degrees around a center point" (claim 15); "in a looping path around the sliding surface and out an exit adjacent to the entry" (claim 18); and "on a path having a first path segment with a first horizontal component of movement" (claim 19). In each of these claims, riders are still taking a non-predetermined path between a starting area and a finishing area that will vary from rider to rider. *Id.*, ¶¶ 39, 45-46.

Next, WhiteWater mischaracterizes the prosecution history in an attempt to claim that ProSlide admitted that Dubeta teaches a non-predetermined path even in the trough portion, 316. To the contrary, ProSlide explained to the Examiner that "Dubeta's trough and substantially parabolic-shaped slide element are not a sphere and they are not a shape approximating one-half of a sphere." (Doc. 188-7, ¶ 40; Doc. 189-34 at 504.) As explained by Mr. Young, a POSA "would understand that this argument in the prosecution history distinguished the prior art based on a different

27

limitation, i.e., 'a shape approximating one-half of a sphere,' not the 'non-predetermined path' term." (Doc. 188-7, ¶ 40.)

This does not contradict the specification's description that the entry and exit features are not part of the concave sliding surface, and a person of ordinary skill in the art would understand that the entry flume and exit flume are not part of the concave sliding surface. (Doc. 188-7, ¶ 46; Doc. 188-10, 248:25-249:16 ("███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ .").)

WhiteWater also contends that ProSlide introduced new constructions for "a non-predetermined path." This is not true. Mr. Young's understanding of the ordinary meaning of this term has remained consistent, as explained in ProSlide's Opposition in Response to Defendant's Motion to Strike and Exclude Opinions of Jason Young, filed herewith.

### 7. The Asserted Claims of the '111 and '480 Patents Are Not Indefinite for Lack of an Antecedent Basis

Contrary to WhiteWater's assertion, "the ride path" in claim 9 does not lack antecedent basis. WhiteWater attempts to read the claim as requiring two different ride paths: "a non-predetermined path" *and* "a path which is at least partially upward." This is plainly incorrect. Considering the claim language as a whole, a POSA would recognize that there is only one claimed ride path, i.e., a non-predetermined path from an entry to an exit, and along some portion of that non-predetermined path the one or

more riders and/or ride vehicles will travel upward to some extent. (*See* Doc. 189-5,
5:3-9 (teaching that there is a "second segment" of the non-predetermined path upon
which the rider moves upward in a positive Z direction).)

WhiteWater's assertion is further nonsensical because *every figure* of the '111 and
'480 patents shows only *one* claimed ride path, i.e., a non-predetermined path from an
entry to an exit, along some portion of which the rider will travel upward to some
extent. (Doc. 188-7, ¶ 49.) Thus, a POSA, in context of the entire patent, would readily
understand that "the ride path" in claim 9 is referring to the non-predetermined path
*from an entry to an exit* such that at some point along the sliding surface the ride path
intersects itself at a point that is below the entry. *Id.*, ¶¶ 48-49.

Similarly incorrect is WhiteWater's assertion that claim 11 claims two different
exits. Contrary to this assertion, the specification explains that the exit depicted in
Figure 1 may be relocated to the position of the exit that is depicted in Figure 2, *not*
that there are multiple exits available on the same slide feature. It is clear to anyone
skilled in the art, and in fact to laymen as well, that there is no second exit present on
any of the nine figures in the '111 patent. (*See, e.g.,* Doc. 189-5, Fig. 1.) Similarly, no
second exit is taught in any of the '111 patent claims. (Doc. 188-7, ¶ 51.)

### 8.    Terms of Degree Do Not Render the Asserted Claims of the '111 and '480 Patents Indefinite

WhiteWater next contends that "an exit adjacent to the entry" in claims 11
and 18 of the '111 patent is indefinite as providing uncertain terms of degree. Not so.
*Sonix*, 844 F.3d at 1377.

A POSA would understand the term "adjacent" to have its plain and ordinary meaning. (Doc. 188-7, ¶ 52.) "Adjacent" is a common word that is readily understandable to a POSA; it is commonly used in the water slide industry to describe structural components of a water slide that are next to or close to each other. *Id.*; *see also Denneroll Holdings Pty Ltd. v. Chirodesign Group, LLC*, No. 4:15-CV-740, 2016 U.S. Dist. LEXIS 21977, at *18 (E.D. Tex. Feb. 23, 2016) ("The ordinary and customary meaning of 'adjacent' would be readily understood by a [POSA]. The phrases using the term 'adjacent' simply describe the locations of the various surfaces of the invention relative to one another. There is nothing about the term that renders the scope of the patent unclear. Accordingly, the term is not indefinite and needs no construction."). Moreover, the '111 patent provides examples and descriptions of various embodiments of the invention, all of which show the entry and exit in close proximity to each other, consistent with the ordinary meaning of "adjacent." (Doc. 188-7, ¶¶ 52-54.)

Equally unavailing is WhiteWater's contention that the limitation "entry is substantially perpendicular to the sliding surface" in claim 1 of the '480 patent is indefinite as a term of degree. *See Multiwave Sensors*, 283 F. Supp. 3d at 1286 (finding "substantially perpendicular" not indefinite). Again, a person of ordinary skill, such as Mr. Young, understands the term to have its plain and ordinary meaning, i.e., "the entry is oriented at approximately a right angle to the sliding surface where the entry joins the sliding surface." (Doc. 188-7, ¶ 58.) Contrary to WhiteWater's contention, the patent need not expressly define the exact distance in degrees of a sphere.

### D.    Genuine Issues of Disputed Fact Preclude Summary Judgment of Noninfringement

A determination of patent infringement requires a two-step analysis. The Court must determine (1) "the scope and meaning of the patent claims asserted," and (2) how "the properly construed claims … compare[] to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). While claim construction is a matter of law, comparison of the claims to the accused device requires a factual determination that every claim limitation or its equivalent is found in the accused device. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). Because infringement is a question of fact, it is properly resolved at summary judgment only "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001).

Each of WhiteWater's noninfringement defenses is based on particular claim limitations that present contested factual disputes. Indeed, for each of its arguments, WhiteWater relies on the opinions of its expert, Dr. Stevick. But ProSlide's expert, Mr. Young, has presented competing infringement opinions and contends that each limitation is satisfied by WhiteWater's accused products. These disputed material facts preclude summary judgment of noninfringement.

1. **The Evidence at Trial Will Show That the Tailspin Infringes the Asserted Claims of the '783 Patent**

   a. **WhiteWater's Tailspin satisfies the "sliding surface" terms**

Similar to its indefiniteness position, WhiteWater misconstrues "sliding surface" in an effort to support its noninfringement position. Specifically, WhiteWater tries to take the illogical position that its Tailspin water slide, sold all over the world, does not have a "sliding surface." This clearly is not true.

WhiteWater's argument that the Tailspin does not satisfy the "sliding surface" term hinges on a mischaracterization of Mr. Young's opinions and testimony, arguing that the "sliding surface" identified by Mr. Young is far larger than the surface area upon which riders and/or ride vehicles slide and also includes portions that cannot be used by riders due to safety concerns. (Doc. 189 at 39.) WhiteWater conveniently ignores Mr. Young's explanation during his deposition that the highlighting in the SolidWorks file was simply due to the limitations of the program itself. (Doc. 188-10, 189-90 ("██████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████.") Instead, Mr. Young showed with annotations where the sliding surface was located in the photographs he took from his inspection of a Tailspin ride installed in Rockford, IL. (Doc. 197-1, ¶¶ 312-13.) Tellingly, WhiteWater's expert, Dr. Stevick, conducted no engineering analysis or testing of a physical Tailspin ride to determine if it satisfied the "sliding surface" or any other claim limitation.

### b.    WhiteWater's Tailspin satisfies the "height with respect to the sliding surface" terms

Next, WhiteWater contends that the Tailspin cannot have an outer lip or top surface of an inner core portion that has "a height with respect to the sliding surface" because a planar surface is required to measure a height, and because the Tailspin has only a curved, helical flume, there is no surface from which to measure the "height with respect to the sliding surface." Not only is this incorrect, but WhiteWater's motion fatally does nothing to combat the fact that Mr. Young, a skilled artisan, was able to measure these elements on the Tailspin and confirm that it infringes. He showed this limitation is satisfied on the actual installed Tailspin that he inspected in Rockford, IL, as well as using a cross-sectional view of the SolidWorks file. (*See e.g.*, Doc. 197-1, ¶¶ 318-320, 328-331.) He further explained during his deposition that a POSA would be able to recognize a height with respect to the floor of the sliding surface. (Doc. 188-10, 199:23-200:11.) These disputed facts preclude summary judgment with respect to this claim limitation.

### 2.    The Evidence at Trial Will Show That the Orbiter Infringes the Asserted Claims of the '508 and '783 Patents

### a.    WhiteWater's Orbiter satisfies the "pitch" and "roll" terms

WhiteWater's arguments that the Orbiter does not meet the "pitch" and "roll" terms of claims 1, 28, and 32, restates its same indefiniteness arguments from above. Specifically, WhiteWater argues that "pitch" and "roll" cannot be defined when applied to a curved object like the Orbiter. As explained above, Mr. Young determined

that a POSA would have no trouble identifying the pitch and roll axes/angles of the Orbiter despite it not being perfectly flat. (Doc. 188-10, 130:9-131:10.) He conducted this analysis in his opening report. (*See e.g.*, Doc. 197-1, ¶¶ 97-107.) Once again, WhiteWater attempts to disregard the competing expert opinions and assert that noninfringement is an undisputed fact. This is incorrect. *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011) (reversing summary judgment award where there were conflicting expert reports, creating a material dispute). Regardless, WhiteWater's point is further belied by the fact that WhiteWater itself was able to measure the "inclination" angle of its Orbiter product, despite it not having a perfectly flat surface. (Ex. I; Doc. 197-1, ¶ 107.)

### b. WhiteWater's Orbiter satisfies the "increase/decrease continuously" terms

WhiteWater contends the Orbiter does not have inner and outer boundaries that "increase continuously along a first potion of the sliding surface" or "decrease continuously along a second portion of the sliding surface." But Mr. Young analyzed the Orbiter SolidWorks file and confirmed that these limitations were satisfied. (Doc. 197-1, ¶¶ 195-197.) Indeed, he provided annotated drawings showing this limitation. These disputed facts preclude summary judgment with respect to this claim limitation.

### c. WhiteWater's Orbiter satisfies the "radius" term of claim 9

WhiteWater also contends that the Orbiter does not satisfy the limitation of claim 9 of the '783 patent because the radius of the outer lip near the inrun does not decrease and thus does not satisfy "a radius of the outer lip decreases along at least a

first portion of the outer lip beginning proximate to the inrun." Again, however, Mr. Young analyzed the Orbiter SolidWorks file and confirmed that this limitation is satisfied. (Doc. 197-1, ¶¶ 234-236.) He provided engineering analysis and measurements from the SolidWorks model showing the decreasing radius. *Id.* WhiteWater does not dispute that his measurements were correct.

### d.    WhiteWater's Orbiter satisfies the "inner core portion defining an inner boundary of the sliding surface" terms

WhiteWater contends that the "inner core portion defining an inner boundary of the sliding surface" terms are unmet by the Orbiter because it argues that the inner lip must lie at the periphery of the slide feature, not in the middle of it. (Doc. 189 at 41-42.) This is incorrect. WhiteWater again tries to limit the claim language to the specific embodiment disclosed in Fig. 14A, running afoul of well settled law. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc). Nothing in the intrinsic record requires the inner lip to lie at the periphery of the slide feature. Regardless, the "inner lip" is not a claim limitation in claims 15 or 20.[5] Claims 15 and 20 require "an inner core portion defining an inner boundary of the sliding surface." And Mr. Young correctly identified the inner core portion defining an inner boundary of the sliding surface in his opening report. (*See, e.g.*, Doc. 197-1, ¶¶ 261-66.)

---

[5] Where the inner lip is a claim limitation, for instance in claims 6 and 25, Mr. Young correctly identified that the Orbiter has an inner core portion defining an inner lip. (*See, e.g.*, Doc. 197-1, ¶¶ 213-217.)

### 3. The Evidence at Trial Will Show That the Aquasphere Infringes the Asserted Claims of the '111 and '480 Patents

WhiteWater contends that Mr. Young includes the entry and exit flumes in his analysis of the sliding surface and thus cannot show that the sliding surface is concave about three axes or is a shape approximating one-half of a sphere. Mr. Young explained during his deposition, however, that his analysis did not include the entry and exit flumes and that the Aquasphere satisfied each of these elements. (Doc. 188-10, 248:6-249:16 ("███████████████████████████████████

███████████████████████████████████

███████████████████████████.").) Thus, at a very minimum, this is another example of competing expert testimony that creates a dispute of material fact. But even without the competing expert opinions, it is clear to a lay person, that the Aqua*sphere* is concave about three axes and has a shape approximating one-half of a sphere.

### 4. The Evidence at Trial Will Show That the Parallel Pursuit Infringes the D'804 Patent

The test for proving infringement of a design patent focuses on whether the appearance of the claimed design and the accused design are substantially similar in the eye of an "ordinary observer," in light of the prior art, giving such attention as a purchaser usually gives to a product. *Egyptian Goddess v. Swisa*, 543 F.3d 665, 677-78 (Fed. Cir. 2008). If the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, then first one patented is infringed by the other. *Id.* at 528.

In applying the "ordinary observer" test, the entire ornamental design, and not just a part of it, must be considered. *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F. 3d 1370, 1378-81 (Fed. Cir. 2002). Indeed, "a piecemeal approach, considering only if design elements independently affect the overall visual impression that the designs are similar, is at odds with [the Federal Circuit's] case law requiring the fact–finder to analyze the design as a whole." *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1131 (Fed. Cir. 2019).

The Federal Circuit has also cautioned that "[m]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010) (citation and quotation marks omitted); *Braun Inc. v. Dynamics Corporation of America*, 975 F.2d 815, 820 (Fed. Cir. 1992) (finding that a design need not be found "identical" to infringe).

The parties appear to agree that the ordinary observer is a water park owner or employee responsible for purchasing new rides.[6] Despite this, WhiteWater confuses the infringement analysis by comparing "a small portion of a portion" of a water ride design to an entire ride, claiming that the Parallel Pursuit cannot infringe because as a whole it is comprised of dozens of twists, turns, and other prominent ornamental features. (Doc. 189 at 47.)

---

[6] ProSlide, however, does not agree with WhiteWater's unsupported statement that the ordinary observer spends months or years involved in the purchase of such rides and pays a great deal of attention. (Doc. 189 at 46-47.)

But even then, ProSlide provided evidence of its own in the form of Mr. Tanzer's proper infringement analysis. Mr. Tanzer first considered the claimed design as a whole to the corresponding portions of WhiteWater's accused Parallel Pursuit and finds that, the relevant portions of WhiteWater's Parallel Pursuit has an overall ornamental design that is *not* plainly dissimilar from the '804 patent's design. Indeed, the claimed design and accused design are both directed to water slides and, more specifically, are both directed to multi-lane water slides with adjacent lanes having open sections, surrounded by closed sections on either end. (Doc. 197-5, ¶¶ 122-23.)

Mr. Tanzer continues with his proper infringement analysis—next comparing the claimed design of the '804 patent to corresponding views of WhiteWater's accused Parallel Pursuit from the perspective of the ordinary observer in light of the prior art.[7] (Doc. 197-5, ¶¶ 124-30.) Mr. Tanzer finds here that WhiteWater's Parallel Pursuit has an overall ornamental design that is substantially the same as the patented design, when considered from the perspective of the ordinary observer—in light of the relevant prior art. *Id.*

WhiteWater provides a cursory and conclusory response to Mr. Tanzer's analysis, but it does not attempt to compare the figures of the patent to corresponding views of the accused ride. Instead, WhiteWater offers zoomed-out images of the accused ride and a snake-themed ride from Polin called the King Cobra, ignoring the

---

[7] Mr. Tanzer based his opinion on publicly-available images and videos of WhiteWater's installed Parallel Pursuit ride, which are confirmed by the CAD files of WhiteWater's ride that WhiteWater continues to maintain are confidential and not to be viewed by Mr. Tanzer.

relevant portions of the asserted patent and the Parallel Pursuit. (Doc. 189 at 49.) This does not refute Mr. Tanzer's testimony that "the '804 Patent and the Parallel Pursuit are substantially similar with respect to at least the transition between the open and closed sections of the adjacent lanes of the water ride." (Doc. 197-5, ¶ 128; *see also id.*, ¶¶ 129-30.)

As Mr. Tanzer explained during his deposition, the King Cobra was dissimilar to the patented design because it was merely a parallel flume ride with capped portions. (Ex. L (Tanzer Expert Dep. Tr.), 139:5-140:2.) This becomes clear if you zoom-in on the relevant sections of the King Cobra design:[8]






---

[8] The following images offer other perspective views of the King Cobra that is referenced in Mr. Delman's Rebuttal Report at p. 153 and WhiteWater's Motion at p. 49. *See* https://www.archiexpo.com/prod/polin-waterparks/product-64440-834954.html (last visited Mar. 3, 2023).

Thus, compared to the Parallel Pursuit design, WhiteWater's analysis in view of the King Cobra actually confirms infringement, showing that the Parallel Pursuit design is even more substantially similar to the '804 design, as it provides similar transitions between the open and closed sections of the adjacent lanes of the water ride, and does not merely "cap" parallel lanes. (*See* Doc. 197-5, ¶¶ 127-30.)

Overall, WhiteWater has not come close to showing that there is no genuine issue of material fact about infringement, and its motion must be denied.

## IV.    CONCLUSION

For the foregoing reasons, ProSlide respectfully requests that the Court deny WhiteWater's motion for summary judgment in its entirety.

40

Dated:  March 3, 2023

Respectfully submitted,

*/s/ James R. Barney*
James R. Barney (*pro hac vice*)
Elizabeth D. Ferrill (*pro hac vice*)
David C. Reese (*pro hac vice*)
Anthony J. Berlenbach (*pro hac vice*)
Sonja Sahlsten, Florida Bar No. 0119797
W. Brady Nash (*pro hac vice*)

FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
202-408-4000
Email: james.barney@finnegan.com
Email: elizabeth.ferrill@finnegan.com
Email: david.reese@finnegan.com
Email: anthony.berlenbach@finnegan.com
Email: sonja.sahlsten@finnegan.com
Email: brady.nash@finnegan.com

Dustin Mauser-Claassen
Florida Bar No.: 0119289
KING, BLACKWELL, ZEHNDER &
WERMUTH, P.A.
25 E. Pine St.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
Email: dmauser@kbzwlaw.com

*Counsel for Plaintiff ProSlide Technology Inc.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, on March 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

<u>*/s/ Dustin Mauser-Claassen*</u>
Dustin Mauser-Claassen